NORFOLK AND WESTERN RAILWAY COMPANY, Norfolk Southern Railway Company, CSX Transportation Inc., and Consolidated Rail Corporation, Plaintiffs,

v.

BROTHERHOOD OF RAILROAD SIGNALMEN, American Train Dispatchers Department of the Brotherhood of Locomotive Engineers, International Brotherhood of Electrical Workers, National Conference of Firemen & Oilers, and Sheet Metal Workers International Association, Defendants.

BROTHERHOOD OF RAILROAD SIGNALMEN, Consolidated Counterclaimant,

v.

CSX TRANSPORTATION, INC., Norfolk Southern Corporation, Consolidated Rail Corporation, Norfolk Southern Railway Company, and Norfolk and Western Railway Company, Consolidated Counterdefendants.

Nos. Civ.A. 97–740–R, Civ.A. 98–145–R.

United States District Court, W.D. Virginia, Roanoke Division.

May 12, 1998.

Sara Bugbee Winn, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, William B. Poff, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, Jeffrey S. Berlin, Mark E. Martin, Sidley & Austin, Washington, DC, for plaintiffs Norfolk and Western Ry. Co, Norfolk Southern Ry. Co.

Ronald M. Johnson, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, William Edward Potts, Jr., Agin, Gump, Strauss, Hauer & Feld, Washington, DC, for CSX Transportation, Inc., Plaintiff.

Arthur Patrick Strickland, Arthur P. Strickland, P.C., Roanoke, VA, for Consolidated Rail Corporation, plaintiff.

John O'B. Clarke, Jr., Melissa Boys Kirgis, Highsaw, Mahoney & Clarke, P.C., Washington, DC, for Brotherhood of Railroad Signalmen, American Train Dispatchers Department of the Brotherhood of Locomotive Engineers, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, International Brotherhood of Electrical Workers, National Conference of Firemen & Oilers, Sheet Metal Workers International Association, defendants.

Katherine Cabell Londos, Wooten & Hart, P.C., Roanoke, VA, Robert A. Mullen, Wooten & Hart, Roanoke, VA, Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, OH, for Brotherhood of Locomotive Engineers, Brotherhood of Maintenance of Way Employees, Defendants.

## MEMORANDUM OPINION

TURK, District Judge.

This matter arises from a dispute between railroads and unions concerning the proposed purchase and division of Consolidated Rail Corporation ("Conrail"). The primary dispute is over whether, as the defendant unions propose, the impact on labor of railroad consolidations overseen by the Surface Transportation Board ("STB")[1] pursuant to the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101 et seq., may be subject to resolution via the statutory method provided in the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq., even when the current labor agreements contain moratorium clauses prohibiting alteration for a specified period, or whether, as the plaintiff railroads propose, the STB provides the exclusive forum for resolution of such labor disputes. The RLA permits unions to resort to self help, such as a strike, if the parties cannot come to final agreement, whereas the STB routinely requires binding arbitration of such disputes.

The plaintiff railroads filed this action seeking declaratory and injunctive relief against the defendant unions, primarily asking the Court to declare that the STB has

---

1. The STB is the successor to the Interstate Commerce Commission ("ICC"). Effective January 1, 1996, the Interstate Commerce Act was amended by the ICC Termination Act of 1995 ("ICCTA"), Pub.L. No. 104–88, 109 Stat. 803. The ICCTA transferred all of the ICC's remaining functions to the STB. These ICA provisions which empowered the ICC thus continue in effect for the STB, though some have been recodified. The precedent cited herein referring to the ICC is fully applicable to the STB.

exclusive jurisdiction over the terms of the proposed transaction, including modifications to labor agreements, and to bar the unions from proceeding under the RLA or from otherwise resorting to self help. Brotherhood of Railroad Signalmen ("BRS"), a defendant in this action, filed an action concerning the same transaction and controversy in the Western District of Pennsylvania, No. 97–1999. That action was subsequently transferred to this Court, docketed as No. 98–145–R, and consolidated with the instant case, No. 97–740–R, as a compulsory counterclaim to plaintiff railroads' complaint. BRS likewise seeks declaratory and injunctive relief, asking the Court to declare that the railroads have an RLA obligation to bargain over BRS' section 6 notices, and to direct the railroads to bargain accordingly. The Court has jurisdiction over the consolidated civil actions pursuant to 28 U.S.C. §§ 1331 and 1337 because federal questions arising under the RLA and the ICA are presented, and the Declaratory Judgment Act authorizes declaratory and injunctive relief, 28 U.S.C. §§ 2201 and 2202.

This matter is before the Court on the following motions: (a) motion to dismiss by consolidated counterdefendant Norfolk Southern Corporation ("NSC"); (b) motion to dismiss Counts II, III, and IV by defendants American Train Dispatchers Department of the Brotherhood of Locomotive Engineers ("ATDD"), International Brotherhood of Electrical Workers ("IBEW"), National Conference of Firemen & Oilers ("NCF & O"), and Sheet Metal Workers International Association ("SMWIA"); (c) motion for partial summary judgment by plaintiffs Norfolk and Western Railway Company ("N & W"), Norfolk Southern Railway Company ("NSR"), CSX Transportation Inc. ("CSXT"), and Conrail; (d) consolidated cross motion for summary judgment and preliminary injunction by defendant Brotherhood of Railroad Signalmen ("BRS"); (e) cross motion for summary judgment by defendants ATDD, IBEW, NCF & O, and SMWIA; and (f) motion to sever by defendant BRS.

## I. Background

On June 23, 1997, NSR, CSXT, Conrail and their parent corporations jointly filed an application with the STB seeking authorization for the acquisition and division of Conrail. The application proposes that a portion of Conrail be operated as part of NSR's rail system, a portion of Conrail be operated as part of CSXT's rail system, and a smaller portion of Conrail be operated by Conrail as "shared assets" for the benefit of both NSR and CSXT. The transaction is hereinafter referred to as the "Conrail transaction." The STB has announced that it will issue its formal decision in the matter on June 8, 1998.

One of the factors the ICA requires the STB to consider and provide is protection of employees affected by the proposed transaction. 49 U.S.C. § 11326(a). Accordingly, the STB routinely imposes the *New York Dock* employee protective conditions on approved transactions. *New York Dock Ry.—Control—Brooklyn Eastern Dist. Terminal*, 360 I.C.C. 60, aff'd sub nom., *New York Dock Ry. v. United States*, 609 F.2d 83 (2nd Cir.1979). Among other terms, the *New York Dock* conditions protect affected employee's wages and fringe benefits for up to six years, even if there is no railroad work for the employee to perform.

The conditions also specify an expedited procedure for reaching negotiated or arbitrated agreements with labor unions to cover implementation of an STB-approved transaction. Article 1, Section 4 of the conditions requires that, before workforces can be consolidated, the participating railroads must give 90 days advance notice to the labor union representing affected employees and attempt to negotiate an agreement with the union. If an implementing agreement cannot be reached through negotiations within a specified period, either party may invoke arbitration under the *New York Dock* conditions, for the purpose of having an arbitrator impose an appropriate implementing agreement. Such arbitration is mandatory, and under Article 1, Section 4 of *New York Dock*, the arbitrator's decision is "final, binding, and conclusive...." 360 I.C.C. at 85. However, because an arbitrator in such a pro-

ceeding acts as an extension of the STB, the arbitrator's decision imposing an implementing agreement is subject to review by the STB. 49 C.F.R. § 1115.8. Either party may seek STB review, and then review of the STB's decision by a court of appeals under the Hobbs Act, 28 U.S.C. § 2342(5).

*New York Dock* implementing agreements are, among other things, the mechanism for consolidating employees from different railroads under one railroad's collective bargaining agreements. The railroads stated in their application that, if the STB approves the Conrail transaction and imposes the standard *New York Dock* conditions, the railroads would then seek to negotiate and reach implementing agreements with the unions pursuant to the *New York Dock* conditions. Although several unions have entered voluntary discussions with the railroads regarding implementing agreements for the proposed Conrail transaction, the STB has not yet granted approval to the Conrail transaction. Accordingly, the railroads have not yet served any formal notices invoking Article 1, Section 4 of the *New York Dock* conditions to seek negotiation of implementing agreements for the Conrail transaction.

The defendant unions, acting jointly with other unions under the name "Allied Rail Unions" ("ARU"), filed Comments in opposition to the Conrail transaction with the STB on October 21, 1997. In these Comments, the ARU asserted that implementation of the anticipated changes in labor agreements "outside RLA processes would violate both the RLA and the ICCTA." The ARU further stated, "Indeed unions would respond to such change by striking and by submitting claims for compensation under the Tucker Act, 28 U.S.C. § 1346." ARU Comments at 57. The ARU explained, ·

> several of the ARU organizations intend to utilize the Railway Labor Act's collective bargaining processes to deal with the impact of the proposed transactions on employees they represent. . . . Those organization[s] also serve notice on the Applicants that they will consider any attempt to change unilaterally existing agreements

or other collective bargaining rights as justifying the resort to self-help.

ARU Comments at 78–79.

Under the RLA, disputes that arise between a railroad and its employees are divided into two categories. Disputes arising from grievances or under the collective bargaining agreement are subject to compulsory arbitration. RLA § 3, 45 U.S.C. § 153. The courts have labeled these disputes "minor." During arbitration of a "minor" dispute, the employer may make changes in working conditions in accordance with its interpretation of the collective bargaining agreement.

A "major" dispute, governed by RLA § 6, 45 U.S.C. § 156, involves the creation or change of a collective bargaining agreement. These disputes are resolved through a lengthy process of negotiation, compulsory mediation, voluntary arbitration, and, if all else fails, strikes and lockouts. During this process, the employer may not impose a unilateral change in the working condition being negotiated.

Distinguishing a major dispute from a minor dispute can be difficult, but the test is deliberately tilted toward finding a dispute minor: Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employers' claims are frivolous or obviously insubstantial, the dispute is major. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) ("*Conrail v. RLEA*"); *RLEA v. Chesapeake Western Ry.,* 915 F.2d 116 (4th Cir.1990).

In support of its Comments, the ARU submitted a declaration by Floyd Mason, Vice President of BRS, stating that BRS "will serve the carriers with a section 6 notice" proposing RLA bargaining to implement the Conrail transaction. Mason Decl. ¶ 6. A section 6 notice is a written notice of proposed changes in collective bargaining agreements, taking its name from section 6 of the RLA, 45 U.S.C. § 156, which specifies the RLA procedures for changing labor agreements, commonly called the "major dispute" procedures. The recipient of a section

6 notice is statutorily required to begin bargaining almost immediately in good faith with the serving party under the RLA. 45 U.S.C. § 152 First. If there is no agreement at the end of these procedures, which can be quite lengthy, the union is free to strike. *Conrail v. RLEA,* 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

BRS followed through on these statements by serving the plaintiff railroads with section 6 notices the same day, October 21, 1997. The railroads objected that the notices were barred by provisions in the current collective bargaining agreements and by the exclusive jurisdiction of the STB, but agreed to meet with BRS without prejudice to their position that the notices were barred. Allred Aff. ¶¶ 2, 16–22; Allman Decl. ¶¶ 25–26; Burton Decl. ¶¶ 24–25.

Collective bargaining agreements in the railroad industry do not necessarily expire. Section 6 of the RLA does not itself place limits on when or how often a union or railroad can serve a section 6 notice to amend agreements. Under section 6, it would be possible for a railroad or union to serve a new section 6 notice immediately upon entering an agreement resolving an outstanding section 6 notice, reopening matters just resolved. In order to ensure that they are not mired in perpetual negotiations under section 6 of the RLA, and to fix the terms of labor agreements for defined periods of time, railroads and unions often agree to include moratorium provisions in their collective bargaining agreements.

BRS is party to collective bargaining agreements with N & W, NSR, CSXT, and Conrail, which agreements contain moratorium provisions. N & W, NSR, and CSXT are party with BRS to an agreement dated August 8, 1996 (the "National Agreement"). Conrail and BRS are party to an agreement dated August 14, 1996 (the "Conrail Agreement"). The National Agreement and the Conrail Agreement contain virtually identical moratorium provisions, which state in relevant part that the agreements

> shall remain in effect through December 31, 1999 and thereafter until changed or modified in accordance with the provisions of the Railway Labor Act, as amended.... No party to this Agreement shall serve, prior to November 1, 1999 (not to become

effective before January 1, 2000), any notice or proposal for the purpose of changing the subject matter of the provisions of this Agreement....

Complaint in Civil Action No. 97–740–R at ¶ 21, Art. X, § 2(a)–(c); BRS Memorandum at 5, fn. 4. The other defendant unions are parties along with each of the plaintiff railroads to collective bargaining agreements which also contain moratorium provisions virtually identical to the language quoted above. Complaint in Civil Action No. 97–740–R at 14–16 (ATDD agreements), 19–22 (IBEW, NCF & O, and SMWIA agreements).

Count I of plaintiffs' complaint is a claim against BRS asserting that the section 6 notices served on plaintiff railroads by BRS are invalid because they are barred by the moratorium provision of the collective bargaining agreements between BRS and the plaintiff railroads. Count II of plaintiffs' complaint is a claim against the other defendant unions asserting that some or all of them intend to serve section 6 notices on plaintiff railroads, and that such notices would likewise be invalid because they would be barred by the moratorium clauses in the respective collective bargaining agreements between the unions and the plaintiff railroads. Count III is a claim against all the defendant unions, including BRS, asserting that the section 6 notices referred to in Counts I and II are or would be invalid and barred on the discrete and independent basis that they do or would involve matters relating to the consolidation of railroads, specifically the Conrail transaction, when such matters are exclusively reserved to the jurisdiction of the STB under the ICA. Count IV of plaintiffs' complaint is a claim against all the defendant unions asserting that some or all of them intend to strike or otherwise exert coercive self-help against the railroads if the railroads attempt unilaterally to change the terms of the collective bargaining agreements between the unions and the railroads.

## II. Analysis

### A. Consolidated Defendant NSC's Motion to Dismiss

The Court will first take up the motion of consolidated counterdefendant Norfolk

Southern Corporation ("NSC") to dismiss it from the action filed by BRS, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

When a defendant raises a challenge to subject matter jurisdiction under Rule 12(b)(1), the burden of proving subject matter jurisdiction is on the plaintiff. In determining whether jurisdiction exists, the court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. The court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Richmond, Fredericksburg & Potomac R.R. v. United States,* 945 F.2d 765 (4th Cir.1991).

■ BRS' action is based entirely on the RLA. The RLA provisions under which BRS is proceeding create bargaining obligations only between a carrier and the representatives of the employees of that carrier. 45 U.S.C. §§ 151, 152, 156. Thus, even if BRS' position as to its ability to require bargaining under the RLA is correct, it could only require bargaining from carriers whose employees BRS represents. BRS represents no employees of NSC. NSC itself is not a railroad, has no employees represented by BRS, and has no labor agreements with BRS.

NSC's subsidiary corporations NSR and N & W are railroads with employees represented by BRS, and these corporations are parties plaintiff to this action. BRS asserts that, in some circumstances, NSC employees act in an agency capacity for N & W and NSR. However, N & W and NSR are bound by the Court's rulings in this case, and they could not permit their agents to act in any manner inconsistent with those rulings.

BRS incorrectly asserts that the National Mediation Board ("NMB") ruled in *Central of Georgia R.R.,* 16 N.M.B. 5 (1988), that NSC, NSR, and N & W are a "single transportation system" for all purposes of employee representation. That case addressed only the proper representative of locomotive engineers, not of signalmen, and further did not find that NSC was properly the "carrier" with which the locomotive engineers should bargain. That case did not role as BRS asserts, and it has no impact on the matter at hand. Moreover, BRS has failed to show any convincing reason why dismissal of NSC as a party to the lawsuit would make complete relief unavailable. Again, NSC is not a railroad and has no employees represented by BRS.

NSC has shown that it has no obligation to bargain with BRS under the RLA, and BRS has failed to show how it could be harmed by NSC's absence from this action. *See Local Union 808, International Brotherhood of Teamsters v. P & W R.R.,* 576 F.Supp. 693, 699 (D.Conn.1983). NSC has shown that it is careful to maintain the distinct and separate nature of the identities of the respective corporations, and BRS has shown no convincing legal or practical reasons for the Court to ignore these separate corporate identifies. *See Brotherhood of Locomotive Engineers v. ICC,* 909 F.2d 909, 913 (6th Cir.1990) (holding that a company's use of a subsidiary is a "sound business practice with which we will not interfere") (citation omitted); *Brotherhood of Maintenance of Way Employees v. St. Johnsbury & Lamoille County R.R./ M.P.S. Associates, Inc.,* 794 F.2d 816 (2nd Cir.1986). The other consolidated counterdefendants N & W, NSR, CSXT, and Conrail will be fully bound by the Court's orders in this case, and their presence ensures that BRS is protected from an incomplete adjudication of this matter. Accordingly, the Court will grant Norfolk Southern Corporation's motion to dismiss it from this action for lack of subject matter jurisdiction.

**B. Non–BRS Unions' motion to dismiss Counts II, III and IV**

The Court will next address the motion of defendant unions ATDD, IBEW, NCF & O, and SMWIA to dismiss the plaintiff railroads' claims against them for lack of subject matter jurisdiction. The Court will hereinafter refer to these unions collectively as the "non-BRS unions," as they are all the defendant unions aside from BRS. Specifically, the non-

BRS unions allege that the railroads' claims against them are unripe because they do not involve a "case or controversy" as required by Article III of the United States Constitution, even in a declaratory judgment context. *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

■ Federal Courts may not decide a matter unless it involves a case or controversy. U.S. Const. Art. III, § 2. The requirement of a case or controversy is no less strict for declaratory judgment than for any other relief. *Altvater v. Freeman,* 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943). The Declaratory Judgment Act explicitly requires an "actual controversy." 28 U.S.C. § 2201(a). The term "actual" is one of emphasis, and not indicative of a different standard from Article III as to what qualifies as a controversy. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and courts do not have a precise test for determining each case. However, courts must look in each case to ascertain whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Mobil Oil Corp. v. Attorney Gen. of Virginia,* 940 F.2d 73, 75 (4th Cir.1991) (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

The non-BRS unions are situated differently than BRS because, unlike BRS, they have not served section 6 notices on any of the plaintiff railroads regarding the Conrail transaction and therefore have not claimed that the railroads presently have a duty to bargain with them under the RLA. For the reasons stated below, the Court agrees that the plaintiff railroads' claims in Counts II and III of their complaint are unripe, but finds that the railroads' claim against the non-BRS unions in Count IV is ripe.

### 1. Non–BRS unions' motion to dismiss Count II

■ The claim against the non-BRS unions in Count II is based on the following statement from page 78 of the Comments of the Allied Rail Unions filed with the STB in regard to the Conrail transaction: "This Board should also be aware that several of the ARU organizations intend to utilize the Railway Labor Act's collective bargaining processes to deal with the impact of the proposed transactions on employees they represent." BRS is the only ARU organization which has followed up on this statement by actually filing section 6 notices with the railroads. This is reflected in the railroads' complaint Count I being directed solely against BRS. Count II is directed against the non-BRS unions.

Count I of plaintiff railroads' complaint plainly is ripe. Defendant BRS has filed a section 6 notice on the railroads and claims that the railroads therefore have a present duty to bargain with BRS under the RLA, which the railroads deny. This controversy is a live issue, not contingent on the happening of some hypothetical or future event. The Court ruled accordingly in its Order of January 16, 1998, denying BRS' motion to dismiss.

The railroads in Count II ask the Court to declare that, if any of the non-BRS unions were to file section 6 notices on the railroads, such notices would be invalid because the moratorium provisions of each union's collective bargaining agreements prohibit such notices. Such a declaration would not be an adjudication of an actual case or controversy, but instead would be a mere advisory opinion regarding hypothetical future conduct. Count II presents an issue which would only become a live controversy if some of the non-BRS unions in fact were to file section 6 notices on some of the plaintiff railroads, and even then the claim would only be ripe against those unions which filed the notices.

The railroads are correct that the threatened filing of section 6 notices in the ARU Comments is made more forceful by the actual filing of section 6 notices by one union, BRS. However, the threat is also lessened by the plain language of the collective bargaining agreement moratorium clauses which prohibit such filings, as discussed in part II.C.2. *infra.*

Further, the railroads will not be irreparably injured by dismissal of Count II because, even under the legal theory expounded by the unions, a union cannot assert that the railroads have a present duty to bargain with it under the RLA unless and until such union has filed a section 6 notice with the railroads.[2] Unlike their claims regarding a unilateral change in existing agreements, the unions have not asserted or threatened that they have the fight to strike or otherwise resort to coercive self-help upon service of a section 6 notice. Upon receipt of a union section 6 notice concerning the Conrail transaction, the railroads would have time to contest the validity of the notice in court, and thus do not face tremendous uncertainty or harmful insecurity in their positions regarding the section 6 notices. Dismissal of Count II would be without prejudice to the railroads' rights to seek legal relief from any section 6 notice in fact filed by such unions in the future. Also, the resolution here of the controversy between BRS, the union which has in fact filed section 6 notices, and the railroads, will likely provide sufficient guidance to the non-BRS unions and the railroads as to dispel legal uncertainty regarding section 6 notices. Because the facts alleged do not show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to Count II, the Court will grant the defendant unions' motion to dismiss as to Count II.

## 2. Non–BRS unions motion to dismiss Count III

■ The non-BRS unions have moved to dismiss as unripe the plaintiffs' claims against them in Count III. Count III is a claim against all the defendant unions, including BRS, asserting that the section 6 notices referred to in Counts I and II are or would be invalid and barred on the independent basis that they do‾or would involve matters relating to the consolidation of rail-

roads, specifically the Conrail transaction, when such matters are exclusively reserved to the jurisdiction of the STB under the ICA. Just as before, when applied to defendant BRS this claim is ripe, but the claim is unripe as against the other unions. Count III proposes a separate basis for the same finding requested in Counts I and II, specifically, that the section 6 notices are or would be improper. However, any basis for this finding is unripe as against the non-BRS unions because they have not yet filed any section 6 notices with the plaintiff railroads regarding the Conrail transaction. Such a ruling would be an advisory opinion as to those parties.

As with Count II, the plaintiff railroads will not be irreparably injured because the dismissal will be without prejudice to their rights to seek legal relief from any such section 6 notices which the non-BRS unions may eventually file. For these reasons, the Court will grant the motion to dismiss Count III as against defendants ATDD, IBEW, NCF & O, and SMWIA. Plaintiffs' Count III will remain as against defendant BRS.

## 3. Non–BRS unions' motion to dismiss Count IV

■ The non-BRS unions have moved to dismiss as unripe the claims against them in Count IV of plaintiff railroads' complaint. Count IV of plaintiffs' complaint is a claim against all the defendant unions asserting that some or all of them intend to strike or otherwise exert coercive self-help against the railroads if the railroads attempt unilaterally to change the terms of the collective bargaining agreements between the unions and the railroads. Plaintiff railroads' claim in Count IV is based primarily on two statements from the Comments of the Allied Rail Unions before the STB:

> Applicants' proposed Operating Plans describe major changes in rates of pay, rules,

---

2. This assertion that the railroads have a duty to bargain upon their receipt of a section 6 notice is legally distinct and separate from the other ARU assertion that any attempt by the railroads to unilaterally change existing agreements would justify the unions' resort to self-help. Under the theory advanced by the unions, the unions' right to resort to self-help does not require prior ser-

vice of a section 6 notice, but instead requires only an "attempt to change unilaterally existing agreements" by the railroads. Counts II and III complain only of improper union section 6 notices. The assertion of a union right to resort to self-help thus is not relevant to Counts II and III, but is addressed in the examination of Count IV in part II.C.3. *infra*.

and working conditions and other rights, privileges, and benefits for employees under the Conrail CBAs. The ARU submits that implementation of such changes outside RLA processes would violate both the RLA and the ICCTA. Indeed unions would respond to such change by striking and by submitting claims for compensation under the Tucker Act, 28 U.S.C. § 1346. ARU Comments at 57.

Plaintiffs' Count IV is also based on the following ARU statement:

> Those organization[s] also serve notice on the Applicants that they will consider any attempt to change unilaterally existing agreements or other collective bargaining rights as justifying the resort to self-help.

ARU Comments at 78–79.

As stated before, the railroads' application before the STB anticipates using the *New York Dock* procedures to negotiate and, if necessary, to arbitrate implementing agreements with the unions which affect the collective bargaining agreements. Under the legal theories advanced by the defendant unions, apparently even the application itself and the railroads' continued pursuit of the Conrail transaction could be construed as an "attempt to change unilaterally existing agreements" outside the RLA processes. The statements made collectively by the unions in the ARU filings as to what would constitute justification for self-help, and their intentions as to the resort to self-help, provide the plaintiff railroads with significant uncertainty as to whether the unions will strike or otherwise resort to coercive self-help, even at the present time.

Executives for some of the defendant unions have submitted affidavits in an attempt to minimize the impact of the ARU statements. However, as discussed more fully *infra* at part II.C.3., the affidavits of the labor executives do not adequately resolve the controversy created by the original statements. The possibility, which remains even after the affidavits are considered, that the unions may strike or otherwise exercise coercive self-help, makes the railroads' claim in Count IV ripe as against all the defendant unions. *RLEA v. Wheeling & Lake Erie Ry.*, 756 F.Supp. 249, 255 (E.D.Va.), *aff'd*, 943 F.2d 49 (4th Cir.1991).

An intent and threat to strike is distinguishable from an intent or threat to serve a section 6 notice, in part because plaintiff railroads would likely suffer sudden irreparable injury in the event of a strike but would not likely suffer such injury from the mere service of a section 6 notice. Because the plaintiffs have adequately alleged a ripe claim in Count IV, the Court will deny the motion of defendants ATDD, IBEW, NCF & O, and SMWIA to dismiss Count IV.

## C. Railroads' motion for partial summary judgment

The Court now turns to plaintiff railroads' motion for summary judgment as to Counts I, III, and IV of their complaint. As the Court has ruled that Count III is unripe as against all the defendants except BRS, the Court will discuss plaintiffs' motion on Count III as against BRS only.

Upon motion for summary judgment, the Court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This case primarily concerns the interaction between two statutes: the RLA and the ICA. In its Memorandum in Support of Motion by BRS for Summary Judgment and for Injunctive Relief filed March 16, 1998 ("BRS Memorandum"), BRS disputed the railroads' assertion that the section 6 notices were barred by the moratorium clauses, stating:

> BRS' actions [in serving section 6 notices] cannot be viewed in isolation, for the BRS made its proposals to change the existing agreements *in response* to the changes that the carriers proposed in their filings

with the STB, changes which on their face are barred by the duration and moratorium clauses. Yet the carriers maintain that they are not barred by the duration or moratorium clauses from proposing such massive changes to the 1996 and other collective bargaining agreements that are protected from change by those clauses. They claim they may propose those changes because, as shown by Count III of their complaint, they assert that the Interstate Commerce Act's consolidation provisions, in particular 49 U.S.C. §§ 11321(a) and 11326(a), supersede the Railway Labor Act's prohibition against unilateral agreement changes and relieve them of whatever contractual commitments they agreed to in August 1996 in the duration and moratorium clauses.

BRS Memorandum at 7–8 (emphasis in original).

Count III of plaintiffs' complaint addresses squarely this dispute concerning the interaction of the RLA and the ICA. Because Count III presents the central issue in this case, the Court will address plaintiffs' motion for summary judgment as to this Count before addressing Counts I or IV.

### 1. Railroads' motion for summary judgment as to Count III.

█ In Count III of their complaint, the railroads assert that the section 6 notices BRS served on October 21, 1997 are invalid and barred because they relate to the subject matter of the protection of employees in connection with the Conrail transaction, which subject matter, the railroads assert, the ICA has placed within the exclusive jurisdiction of the STB. BRS responds with the assertion that, under the Supreme Court's decision in *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) (*"Telegraphers"*), unions are not required to seek protection through ICA processes from the impact on labor of transactions which are subject to the ICA processes, but instead the unions may choose to seek protection from such impact under regular RLA processes.

However, the Court's ruling in *Telegraphers* has been limited by later rulings of the Supreme Court. *CSX Transp., Inc. v. United Transp. Union*, 950 F.2d 872, 879 (2nd Cir.1991); *RLEA v. CSX Transp.*, 938 F.2d 224, 229 (D.C.Cir.1991) (*citing Pittsburgh & Lake Erie Railroad Co. v. RLEA*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989)); *see also RLEA v. Chesapeake W. Ry.*, 738 F.Supp. 1544, 1555 (E.D.Va.), *aff'd on other grounds*, 915 F.2d 116 (4th Cir.1990); *Norfolk & Western Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

In *Norfolk and Western Ry. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (*"Dispatchers"*), the Supreme Court addressed modifications to labor agreements made via the *New York Dock* conditions, outside the RLA. There, discussing the STB's predecessor body, the Interstate Commerce Commission ("ICC"), the Court stated that the ICA vests the ICC with "exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction." *Id.* at 119. Accordingly, the Court ruled in *Dispatchers* that, under the ICA, a carrier may be exempted from its legal obligations under a RLA collective bargaining agreement when necessary to carry out an approved transaction. The Court explained that its determination that the ICA supersedes RLA collective bargaining obligations as necessary to carry out an approved transaction is proper in that "the Act imposes a number of labor protecting requirements to ensure that the Commission accommodates the interests of affected parties to the greatest extent possible." *Id.* at 133, 111 S.Ct. 1156.

BRS' position would remove any meaning from the Supreme Court's holding in *Dispatchers*. If, as BRS asserts, a union may force a railroad to enter RLA negotiations with it concerning an ICA transaction by serving a section 6 notice, that railroad obviously is not exempt from its RLA collective bargaining obligations, even if such an exemption is necessary to carry out an approved transaction. Rather, the Court's holding in *Dispatchers* establishes that the ICC, now the STB, has "exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction[,]" including

the labor protection terms of those transactions. 499 U.S. at 117, 133, 111 S.Ct. 1156; *CSX Transp., Inc. v. United Transp. Union,* 86 F.3d 346, 349 (4th Cir.1996) (*"CSXT v. UTU "*); 49 U.S.C. § 11321(a).

The statutory exemption addressed in *Dispatchers* applies only after a transaction has been approved, and the STB has yet to issue its decision on the Conrail transaction. 49 U.S.C. § 11321(a). Nonetheless, the ruling in *Dispatchers* proves incorrect BRS' assertion that there is no conflict between the ICA and RLA procedures for modifying labor agreements. As the *Dispatchers* Court explained, if the RLA major dispute procedures applied, they would frustrate railroad consolidations found by the STB to be in the public interest. Also, in this case, if it grants approval to the Conrail transaction, the STB will not be able to authorize modification of the labor agreements without applying the statutory exemption which limits the permitted modifications to those necessary to the implementation of the transaction, because the moratorium provisions in the agreements prohibit modification outside RLA processes, as discussed *infra* in part II.C.2.

Although · the exemption interpreted in *Dispatchers* is not yet applicable because the STB has not yet issued its decision, the STB's exclusive jurisdiction to examine, condition, and approve the transaction is fully applicable. 49 U.S.C. §§ 11321(a) and 11324(a). That jurisdiction encompasses determining how disputes over changes to labor agreements necessary to implement a transaction will be resolved. 49 U.S.C. § 11326(a). BRS is participating in the STB's review of the Conrail transaction by joining the ARU in filing comments opposing the transaction and requesting, in the alternative, imposition of labor protection provisions other than the *New York Dock* conditions.

Unions cannot assert rights independent of the STB's procedures for making changes to agreements necessary to implement transactions approved under the ICA's railroad consolidation provisions. *RLEA v. Southern Pacific Transp. Co.,* 7 F.3d 902 (9th Cir. 1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); *CSXT v. UTU,* 86 F.3d at 349 (4th Cir.1996). In *RLEA v. Southern Pacific,* the court stated that the union could not assert RLA rights in the face of "the ICC's exclusive jurisdiction in the field of railroad mergers and the breadth of its authority" even though the statutory exemption was not at issue: "[T]he holding of *Dispatchers* and its overall conception of the statutory scheme is determinative of this case." 7 F.3d at 906–7.

BRS next offers as support for its position that the STB's jurisdiction is not exclusive the fact that the ICA permits voluntary informal discussions between unions and carriers outside ICA processes. 49 U.S.C. § 11326(a). However, the Court rejects BRS' supposition that there is no valid distinction between voluntary informal negotiation on the one hand, and, on the other, compulsory bargaining conducted against a party's wishes under the RLA processes which ultimately may result in a strike.

Indeed, the railroads have engaged in voluntary discussions, not under the RLA, with many other unions in an attempt to reach implementing agreements for the Conrail transaction even before the STB announces its decision granting or denying approval for the transaction. *See* Plaintiffs' Supplemental Memorandum in Support of their Motion for Partial Summary Judgment filed April 17, 1998 ("Supplemental Memorandum"), at 2–4; and Railroads' Reply to Response of Unions to Railroads' Supplemental Memorandum filed May 1, 1998 at 5. The railroads represent that they have already entered into implementing agreements with some of the unions affected by the Conrail transaction, including one union which was a member of the ARU and a defendant in this case, but which has since been dismissed by the plaintiffs. *Id.*

Certainly it is in the best interests of all the parties, and in the interests of justice as well as efficiency, to permit unions and carriers to voluntarily negotiate implementing agreements, if possible, without resorting to a formal process. The ICA so permits, though the STB-appointed procedures would remain available if informal negotiations do not resolve the issues. 49 U.S.C. § 11326(a). This does not mean that the unions may force the negotiations to take place outside

the STB-appointed procedures and instead under RLA procedures, as BRS suggests.

The ICA vests the STB with exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction. 49 U.S.C. § 11321; *Dispatchers,* 499 U.S. at 117, 133, 111 S.Ct. 1156; *CSXT v. UTU,* 86 F.3d 346, 349. The STB's jurisdiction attaches when an application is filed. 49 U.S.C. § 11324(a). The STB is charged with providing for the protection of employees affected by those transactions. 49 U.S.C. § 11326(a). The section 6 notices served by BRS relate to the subject matter of the protection of employees in connection with the Conrail transaction, which is within the exclusive jurisdiction of the STB. Therefore the notices are invalid and have no legal effect. The notices create no duties on the part of the plaintiff railroads to bargain with defendant BRS under the RLA. Accordingly, the Court will grant the plaintiff railroads' motion for summary judgment as to Count III.

The railroads have requested, in addition to declaratory relief, an injunction requiring BRS to withdraw its 1997 section 6 notices and barring BRS from serving any other section 6 notices or otherwise attempting to force the railroads to bargain with BRS contrary to the Court's judgment as to Count III. Because the Court has declared that those section 6 notices are invalid and ineffective, it is not necessary that they be withdrawn. The invalid notices impose no duties or obligations on the railroads. Any similar notices would also be ineffective, and the railroads would be able to challenge them as they have these notices. The railroads have not shown that further injunctive relief is necessary as to Count III. Accordingly, the plaintiffs' requests in Count III for injunctive relief will be denied.

**2. Railroads' motion for summary judgment as to Count I**

The railroads's claim in Count I that the section 6 notices served upon the railroads by BRS on October 21, 1997 are invalid and are barred by the moratorium provisions of the respective collective bargaining agreements between BRS and the railroads. On its face, this controversy seems to be a "minor dispute," involving only the interpretation of the labor agreements between BRS and the railroads. *See* part I., *supra.* The railroads clearly have a non-frivolous argument that the section 6 notices served by BRS are barred by the moratorium provisions in the agreements, since those provisions state that neither side may serve section 6 notices on the other until late 1999. Thus, the Court would be inclined to send the matter to arbitration under the RLA minor dispute procedures. However, the statements and positions of the parties reveal that the dispute is actually over the meaning of the applicable laws, not of the agreements. *CSX Transp., Inc. v. United Transp. Union,* 950 F.2d 872 (2d Cir.1991).

In arguing that the moratorium clause issue is not a "minor dispute" subject to arbitration but instead is a matter that should be decided by the Court, BRS states that "there is no dispute over the meaning of those provisions." BRS Memorandum at 13. The Court agrees. In *Seaboard World Airlines, Inc. v. Transport Workers Union of America,* 425 F.2d 1086 (2d Cir.1970), the Second Circuit Court of Appeals considered whether a strike allegedly in violation of a moratorium provision in a labor agreement under the RLA was a question of interpretation to be submitted for arbitration. The Second Circuit explained, "[W]e are unable to see that any relevant question of interpretation exists in this case. Whatever 'permanent' may mean, the agreement is utterly plain that no reopening of any kind is permitted prior to July 1, 1974...." 425 F.2d at 1090. The court then stated,

> The Supreme Court has said, although admittedly in a somewhat different context, that where there is 'no question of interpretation or application of the collective agreement, but rather only one of its validity under the statute, the case is not one in which resort to the grievance and Adjustment Board machinery provided by the Railway Labor Act was required.'

425 F.2d at 1090 (quoting *Felter v. Southern Pacific Co.,* 359 U.S. 326, 327–328, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959)); *see also CSX Transportation, Inc. v. United Transportation Union,* 950 F.2d 872, 876 (2d Cir.1991)

and *Chicago & North Western Transportation Co. v. RLEA*, 908 F.2d 144, 156 (7th Cir.1990), *cert. denied*, 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 647 (1991) ("If there is no dispute over the meaning of a contract, there is nothing for [the arbitrators] to do").

The dispute here concerns, according to BRS' viewpoint, the railroads' freedom to pursue changes to labor agreements outside the RLA process simply by filing an application to the STB for approval of a transaction. This is in the face of the labor agreements' explicit prohibition of any alteration outside the RLA process, and the labor agreements' explicit prohibition even of alteration within the RLA process for a set period of time. BRS asserts that, if the moratorium clauses do not stop the railroads from pursuing changes to labor agreements under the ICA, then the moratorium clauses should not be able to stop the unions from making counterproposals under the RLA.

However, as stated, the railroads are requesting approval of a proposed railroad consolidation. As discussed in part II.C.1. *supra*, the STB has exclusive jurisdiction under the ICA to examine, condition, and approve railroad consolidations. If the STB approves the Conrail transaction, the railroads will be able to pursue, through the STB-imposed procedures, changes in labor agreements necessary to implement the transaction. The railroads would be blocked by the existing moratorium clauses from pursuing these changes in labor agreements but for the ICA's grant of an exemption from "all other law" as necessary to implement an approved transaction. *Dispatchers*, 499 U.S. 117, 111 S.Ct. 1156.

However, the railroads have not yet taken any action which violates the moratorium clauses. The 1996 National Agreement, to which N & W, NSR, CSXT, and BRS are parties, contains moratorium provisions which are identical in relevant part to those contained in the current 1996 collective bargaining agreement between Conrail and BRS. These provisions state in relevant part that the agreements

shall remain in effect through December 31, 1999 and thereafter until changed or modified in accordance with the provisions of the Railway Labor Act, as amended.... No party to this Agreement shall serve,

prior to November 1, 1999 (not to become effective before January 1, 2000), any notice or proposal for the purpose of changing the subject matter of the provisions of this Agreement....

Complaint in Civil Action No. 97–740–R at ¶ 21, Art. X, § 2(a)–(c); BRS Memorandum at 5, fn. 4.

The railroads note that they have not served BRS with any notice or proposal. Their application for approval of the Conrail transaction was filed with the STB and was not a notice served on BRS. *See* Railroads' Memorandum in Support of Motion for Summary Judgment filed April 2, 1998 ("Railroads Memorandum"), at 22. As part of that application, the railroads, in accordance with STB rules, described the types of changes in labor agreements they anticipate would be necessary to realize the public interest benefits of the Conrail transaction. The question of what specific changes in fact are necessary to implement the transaction would be the subject of future proceedings pursuant to the required STB-imposed employee protection conditions, in the event that the STB approves the transaction.

If, as the parties anticipate, the STB imposes the *New York Dock* conditions upon approving the transaction, any party could begin formal *New York Dock* negotiations by serving the other side with a notice under Article 1, Section 4 of *New York Dock*. Service of such a notice would perhaps implicate the current collective bargaining agreement moratorium provisions on their face, though of course the STB has exclusive jurisdiction over the subject matter of railroad consolidations. *Dispatchers*, 499 U.S. 117, 111 S.Ct. 1156. However, the railroads have not taken action yet which even facially violates the moratorium provisions of the labor agreements with BRS. BRS' position is therefore unjustified.

BRS apparently holds the position that the railroads' application before the STB enables BRS to respond under the RLA by filing section 6 notices containing BRS' counterproposals despite the moratorium provisions. The Court's ruling granting the railroads' summary judgment as to Count III of their complaint shows BRS' position to be incor-

rect. The railroads have not violated the moratorium provisions, even on their face. The STB's exclusive jurisdiction over this subject matter prevents either side from forcing the other to proceed under the RLA. The railroads are operating under the ICA, which authorizes their actions, and they are not in violation of the RLA or their collective bargaining obligations.

BRS, on the other hand, claims to be operating under the RLA, or at least seeking to operate under the RLA. However, BRS cites no law or provision exempting it from the RLA agreement moratorium clauses which explicitly prohibit the very serving of RLA section 6 notices which it has undertaken. BRS claims that it is unfair for the railroads to be able to propose changes to labor agreements under the ICA when the unions allegedly have no ability to offer counterproposals, as BRS states:

> Obviously, the carriers believe that the duration and moratorium clauses do not apply to their proposals, and if they are not barred from proposing the changes which they have outlined they will make following STB approval of their merger proposal, it logically follows that BRS is not barred by those same agreement provisions from proposing its own changes in *response* to the carriers' proposals.

BRS Memorandum at 6 (emphasis in original).

BRS is correct on this point; it is not blocked from offering its counterproposals to the railroads. But BRS must offer its counterproposals via the methods authorized by the ICA: either through voluntary negotiations or through the procedures imposed on the transaction by the STB. The moratorium clauses remain effective in that both BRS and the railroads are barred from serving RLA section 6 notices on each other. The ICA provides an exemption only for proceedings under the ICA, not under the RLA.

Indeed, BRS' position that RLA procedures are never affected by the ICA is undermined by BRS' assertion that the railroads' filing of an STB application somehow permits the otherwise-barred serving of RLA notices.

BRS's own actions provide the examples demonstrating that BRS is not barred from responding to the railroads' proposals but instead is legally capable of, and in fact presently engaged in, responding to the railroads' proposals. First, BRS, by participating in the ARU Comments to the STB, has made counterproposals to the railroads under the ICA. Second, BRS, by meeting with the railroads without prejudice to either side's position in this litigation, has again been able to present its counterproposals to the railroads through voluntary negotiations. The Court notes the latter as an example only, and does not consider such meetings to have any legally-prejudicial effect.

Neither of these opportunities for responding to the railroads' STB application violated BRS' RLA collective bargaining agreement obligations. The 1996 BRS National Agreement, which is virtually identical to the 1996 BRS–Conrail agreement, states immediately after the moratorium provision, "This Article will not bar management and the organization on individual railroads from agreeing upon any subject of mutual interest." Complaint at 9, ¶ 21; Art. X, § 2(d) of National Agreement. Although BRS is fully able to respond to the railroads' proposals through alternative ways, BRS asserts an unqualified right to force the railroads into RLA major dispute bargaining.

There is no dispute as to the meaning of the moratorium provisions; those provisions are clear. BRS does not fail to understand the meaning of the moratorium provisions, but instead fails to understand the interplay between the ICA and the RLA regarding the subject matter of railroad consolidations, and specifically the effect of the ICA on collective bargaining obligations. *Dispatchers*, 499 U.S. 117, 111 S.Ct. 1156; *RLEA v. Southern Pacific Transp. Co.*, 7 F.3d 902 (9th Cir. 1993), *cert. denied*, 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); *CSXT v. UTU*, 86 F.3d at 349 (4th Cir.1996). BRS insists that it be permitted to proceed under the RLA major dispute procedures, against the railroads' wishes, because those procedures give the unions more leverage. Declaration of W.D. Pickett at ¶ 7. Again, BRS cites no provision exempting it from the RLA agreement moratorium clauses which prohibit the serving of RLA section 6 notices, and the

railroads' application before the STB does not provide an excuse for the service of otherwise-barred RLA section 6 notices.

By serving the section 6 notices on the railroads in October 1997, BRS unilaterally repudiated the moratorium provisions of BRS' 1996 agreements with the railroads. Section 2, First of the RLA provides a statutory duty to "maintain agreements," which BRS has violated. 45 U.S.C. § 152, First. Additionally, BRS has violated RLA section 6 by attempting unilaterally to change the terms of existing agreements. *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). BRS offers no non-frivolous interpretation of the moratorium provisions to justify its repudiation; again it admits that there is no dispute over their interpretation.

Nonetheless, in October 1997, BRS served section 6 notices on the plaintiff railroads in clear defiance of the terms of BRS' current labor agreements with the railroads. These section 6 notices therefore impose no RLA bargaining obligation on the railroads. To this extent, the Court will grant the plaintiff railroads' motion for summary judgment as to Count I.

The Court is not without jurisdiction to, as the railroads request, enjoin BRS to comply with its statutory obligation not to repudiate its agreements. *Chicago & North Western Ry. v. United Transp. Union*, 402 U.S. 570, 577, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Seaboard World Airlines, Inc. v. Transport Workers Union*, 425 F.2d 1086 (2d Cir.1970); *Seaboard World Airlines, Inc. v. Transport Workers Union*, 443 F.2d 437, 439 (2d Cir. 1971) (enforcement of moratorium clauses prevents labor agreements from being "subject to reopening every thirty days" under RLA section 6, and so avoids "convert[ing] an Act intended as an instrument for achieving industrial peace into a potent weapon for perpetual warfare"). However, for the reasons stated above concerning Count III, the plaintiffs' requests in Count I for injunctive relief will be denied.

**3. Railroads' motion for summary judgment as to Count IV**

■ In Count IV of their complaint, the plaintiff railroads assert that some or all of the defendant unions intend to strike or otherwise exert coercive self-help against the railroads if the railroads attempt unilaterally to change the terms of the collective bargaining agreements between the unions and the railroads. The railroads claim that such strikes or self-help would be improper and should be enjoined self-help by a party affected by a railroad consolidation is not authorized by the STB, which has exclusive jurisdiction over the conditions governing railroad consolidations.

In their Comments filed before the STB, the ARU, of which the defendant unions are members, state, "Those organization[s] also serve notice on the Applicants that they will consider any attempt to change unilaterally existing agreements or other collective bargaining rights as justifying the resort to self-help." ARU Comments at 78–79. The Comments also contained the statement, "Indeed unions would respond to such change by striking and by submitting claims for compensation under the Tucker Act, 28 U.S.C. § 1346." ARU Comments at 57.

Some of the unions have submitted declarations of their executives in an attempt to show that the statements made in the ARU Comments no longer apply and that they do not intend to strike. The declarations state that the unions have "no present intention of serving a Section 6 notice on the plaintiffs in this case" and that the unions do not "have any plans or intention of exercising self-help against plaintiffs over their merger proposal." *See* Declarations of Donald C. Buchanon, Daniel L. Davis, George J. Francisco Jr., and Les Parmelee. These declarations, while somewhat reassuring, are not adequate to obviate the need for injunctive relief. The declarations do not constitute a disavowal of the ARU position, nor do they state that the unions will not exercise self-help over the merger proposal. The statements leave open the possibility that such action may be justified and could be acted on in the future if the labor executives change their minds.

In *RLEA v. Wheeling & Lake Erie Ry.*, 756 F.Supp. 249 (E.D.Va.), *aff'd.* 943 F.2d 49 (4th Cir.1991), the unions filed similarly ambiguous and limited declarations in an effort to forestall an injunction. The court there found that "the declarations are vague and

equivocal on critical points and provide no adequate substitute for the entry of a permanent injunction." *Id.* at 255.

Though it does not impact the unions' arguments, the Court notes that plaintiff railroads have demonstrated a willingness to dismiss union defendants, such as the Brotherhood of Maintenance of Way Employees and the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, when such unions submit assurances adequate to foreclose any need for further relief. *See* Plaintiffs' Supplemental Memorandum at 1–3.

Under the positions taken by the defendant unions in the ARU Comments and not subsequently disavowed by them, the railroads' mere filing of an application stating that changes to labor agreements will likely be necessary to implement the transaction could apparently constitute an "attempt to change unilaterally existing agreements" to which the unions object and threaten self-help. The unions could also view as grounds for serf-help any further steps towards or in favor of the Conrail transaction by the railroads. By their statements collectively as the ARU, the defendant unions have provided the railroads with significant insecurity as to maintaining their economic well-being.

The Fourth Circuit addressed the public policy interest in preventing improper railroad strikes in *CSXT v. UTU,* stating,

> The avoidance of strikes is crucial to the public interest in maintaining the nation's transportation system. 'The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern'

86 F.3d 346, 349 (4th Cir.1996) (*quoting Virginian Ry. Co. v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937), other citations omitted).

Based on the Court's ruling as to Count III, it is clear that the defendant unions may not legally strike or otherwise exert coercive self-help in connection with the implementation of the Conrail transaction, unless such self-help is specifically authorized by the STB. As stated before regarding Count III,

unions cannot assert rights independent of the STB-imposed procedures for making changes to agreements necessary to implement transactions approved under the ICA's railroad consolidation provisions. *Norfolk and Western Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991); *RLEA v. Southern Pacific Transp. Co.,* 7 F.3d 902 (9th Cir. 1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); *CSXT v. UTU,* 86 F.3d at 349 (4th Cir.1996). The defendant unions may not legally seek to force plaintiffs to bargain with them regarding the Conrail transaction, except that, if the STB grants approval to the Conrail transaction, the defendant unions may pursue whatever procedures the STB sets out for the negotiation or arbitration of implementing agreements in this transaction. Accordingly, the Court will grant plaintiffs' motion for summary judgment as to Count IV.

The Court will also issue a permanent injunction, lasting a period of twelve months, which bars defendants BRS, ATDD, IBEW, NCF & O, and SMWIA from striking or otherwise exerting coercive self-help in an attempt to block implementation of the Conrail transaction or in an attempt to force plaintiff railroads or affiliated carriers to bargain with them regarding the terms of the Conrail transaction except as specifically authorized by the STB or the ICA. The parties of course remain free to return to the Court seeking clarification of any issues concerning this injunction. The injunction will automatically and immediately end if the STB denies approval of the Conrail transaction.

### D. BRS' cross motion for summary judgment and preliminary injunction

BRS' one-count claim was originally filed in Pennsylvania and was transferred here and consolidated with the plaintiffs' action as a compulsory counterclaim. BRS has moved for summary judgment and for a preliminary injunction. BRS seeks a declaration that the railroads have an RLA obligation to bargain over BRS's section 6 notice, and BRS seeks an injunction directing the railroads to bargain accordingly. BRS' counterclaim, and plaintiff railroads' claims involved the same

underlying and dispositive legal arguments. The Court considered the arguments of BRS in its consideration of the plaintiffs' motion for summary judgment. Because both claims are decided by a single decision of those legal issues, the Court will construe plaintiff railroads' motion for summary judgment to be a cross motion for summary judgment as to BRS' consolidated counterclaim as well, and will grant that motion for summary judgment against BRS' consolidated counterclaim. BRS' assertions in its counterclaim are foreclosed by the Court's rulings as to plaintiffs' Count III, in part II.C.1. *supra*, and as to plaintiffs' Count I in part II.C.2. *supra*. Accordingly, the Court will deny BRS' motion for summary judgment as to its consolidated counterclaim and its motion for preliminary injunction, and will dismiss BRS' counterclaim.

### E. Non–BRS unions' cross motion for summary judgment

Defendant unions ATDD, IBEW, NCF & O, and SMWIA filed a cross motion for summary judgment as to the plaintiffs' claims against them. The Court considered the arguments of these defendant unions in its consideration of the plaintiffs' motion for summary judgment. The Court having granted the plaintiffs' motion for summary judgment, which is dispositive of the issues presented by the defendant unions' motion, the Court will deny defendants ATDD, IBEW, NCF & O, and SMWIA's cross motion for summary judgment.

### F. BRS' motion to sever

BRS has moved to sever the plaintiffs' claims against it from the plaintiffs' claims against the other unions. BRS had some concerns regarding the finality of this judgment, as the plaintiffs had not moved for summary judgment as to Count II of their complaint. The Court notes that all the parties' claims are disposed of by this judgment and thus BRS' motion to sever is unnecessary to render the judgment final. Seeing no further need for the motion, the Court will deny BRS' motion to sever.

### III. Conclusion

For the reasons stated above, the Court will (a) grant consolidated counterdefendant NSC's motion to dismiss it for lack of subject matter jurisdiction; (b) grant defendants ATDD, IBEW, NCF & O, and SMWIA's motion to dismiss as to Counts II and III, but deny the motion as to Count IV; (c) grant plaintiffs N & W, NSR, CSXT, and Conrail's motion for partial summary judgment as to Count III against only defendant BRS, grant their motion as to Count I against BRS, and grant their motion as to Count IV against all the defendants; (d) deny BRS' consolidated cross motion for summary judgment and preliminary injunction and dismiss BRS' consolidated counterclaim; (e) deny defendants ATDD, IBEW, NCF & O, and SMWIA's cross motion for summary judgment; (f) and deny BRS' motion to sever. The Court will issue an injunction barring the unions from exerting self-help in an attempt to block implementation of the Conrail transaction or to force the railroads to bargain regarding implementation of the Conrail transaction outside the STB-imposed procedures.