**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CSX TRANSPORTATION,
INCORPORATED,
Plaintiff-Appellee,

v.

UNITED TRANSPORTATION UNION;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS,
Defendants-Appellants.

No. 96-1172

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-96-212-CCB)

Argued: May 6, 1996

Decided: June 7, 1996

Before WILKINSON, Chief Judge, and HALL and LUTTIG,
Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Hall and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Richard S. Edelman, HIGHSAW, MAHONEY &
CLARKE, P.C., Washington, D.C., for Appellants. Ronald Maurice
Johnson, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.,

Washington, D.C., for Appellee. **ON BRIEF:** William G. Mahoney, Donald F. Griffin, HIGHSAW, MAHONEY & CLARKE, P.C., Washington, D.C.; Clinton J. Miller, III, General Counsel, UNITED TRANSPORTATION UNION, Cleveland, Ohio; Harold A. Ross, ROSS & KRAUSHAAR, P.A., Cleveland, Ohio, for Appellants.

_____

**OPINION**

WILKINSON, Chief Judge:

This case requires us to assess the propriety of a district court's anti-strike injunction, which was issued to enforce an arbitration decision made pursuant to the Interstate Commerce Act ("ICA"). CSX Transportation sought to consolidate four separate railroads that it had acquired. The unions representing the railroads' employees opposed the consolidation. After the arbitrator's award in favor of CSX's proposed consolidation was upheld by the Interstate Commerce Commission ("ICC"), the unions threatened a strike. CSX then obtained an injunction prohibiting that strike. The unions now appeal this injunction, contending that the Norris-LaGuardia Act ("NLGA") prohibits anti-strike injunctions to enforce arbitration awards under the Interstate Commerce Act. We disagree. The NLGA may not be used to circumvent the "final, binding, and conclusive" arbitration process that is undertaken pursuant to the ICC's interpretation of the ICA, 49 U.S.C. § 11347 (now recodified at 49 U.S.C.§ 11326). New York Dock Railway-Control-Brooklyn Eastern Dist. Terminal , 360 I.C.C. 60, 78, 88 (1979), aff'd sub nom. New York Dock Ry. v. United States, 609 F.2d 83 (2d Cir. 1979). We therefore affirm the judgment of the district court.

I.

CSX Transportation, Inc. was formed from eleven rail carriers and their subsidiaries, including the Baltimore and Ohio Railroad ("B&O"), the Chesapeake and Ohio Railroad ("C&O"), the Western Maryland Railway ("WM"), the Louisville and Nashville Railroad, Seaboard Coast Line Railroad, and the Richmond, Fredericksburg, and Potomac Railroad ("RF&P"). The CSX network is one of the

nation's largest, totaling 18,800 miles in 19 states, the District of Columbia, and Ontario, Canada. Its employees are represented by the United Transportation Union and the Brotherhood of Locomotive Engineers ("unions").

CSX has attempted to merge these various operations into a single, integrated network. It is one of these attempts at consolidation that gave rise to the present dispute. CSX claimed that its attempts at integration were hindered by the existence of separate labor agreements with the railroads' unions. The practical result of these separate agreements was that CSX could not use its engineers and trainmen throughout its system, but was forced to operate separate workforces within the geographic confines of each former railroad. This apparently caused train delays (as trains passing from one railroad to the next had to switch crews) and frustrated CSX's ability to efficiently allocate manpower across railroad boundaries.

On January 10, 1994, CSX gave notice to the unions that it intended to consolidate train operations on the WM, RF&P, a portion of the C&O, and then merge these into the B&O. This would create a unified operation between southern Pennsylvania and southern Virginia called the Eastern B&O Consolidated District. The new territory was to be governed by the collective bargaining agreement applicable to the former B&O district, and the consolidation therefore would require changes in the collective bargaining agreements for the WM, RF&P, and the C&O. In particular, the working and seniority lists of the various territories would be consolidated, there would be a temporary loss of positions (CSX anticipated adding more trains and positions after the consolidation), some supply points would be closed, and reporting points would be changed for some employees, thus requiring their transfer. Otherwise, the terms of the collective bargaining agreements applicable to the employees on these lines would remain unchanged in the new B&O district.

Pursuant to § 11347 of the ICA as interpreted by the ICC's decision in New York Dock, 360 I.C.C. at 60, a railroad must establish protective conditions for employees who are adversely affected by a consolidation. 49 U.S.C. § 11347. Because the unions claimed that CSX's planned alteration of bargaining units would violate New York Dock, the unions refused to participate in the negotiation of a protec-

3

tive agreement. Under the terms of New York Dock , the dispute was then submitted to mandatory arbitration. Both the unions and CSX agreed to Robert M. O'Brien as their arbitrator.

O'Brien held a hearing on March 28, 1995. At this hearing, both parties presented extensive arguments and a "plethora of evidence." On April 24, the ALJ, pursuant to New York Dock , 360 I.C.C. at 78, issued his "final, binding, and conclusive" award. O'Brien agreed with CSX, holding that CSX's proposed changes flowed from the merger and were necessary to secure the public benefits of that merger: "Were the Carrier required to continue operating this territory as four separate railroads each with its own work force and seniority district, the operating efficiencies contemplated by the coordination would be illusory." O'Brien noted that the vast majority of the former collective bargaining agreements would be preserved in the consolidation and that this case was not an attempt by CSX to transfer wealth from employees to CSX. Indeed, under the New York Dock protective arrangement set forth by CSX, any displaced employees would continue to receive their full wages and fringe benefits for a period of years--even if they were not working. In short, the arbitrator's approval of CSX's consolidation was contingent upon CSX making whole all displaced employees. See New York Dock , 360 I.C.C. at 60.

Both parties appealed aspects of O'Brien's decision to the ICC. On November 22, 1995, the ICC affirmed O'Brien's findings of fact and conclusions of law:

> Because the proposed implementing agreements are necessary to effect the proposed transaction and would not override any "rights, privileges, and benefits" that must be preserved under our New York Dock labor protection conditions, we conclude that those agreements satisfy the requirements of our labor protection conditions. The agreements should therefore be adopted.

The unions then sought a stay from the United States Court of Appeals for the District of Columbia Circuit. The court denied this motion on January 5, 1996.

On January 15, CSX notified the unions that it would implement the consolidation on January 30. Four days before the consolidation

4

was to take place, the unions announced that they would strike unless CSX rescinded its plans. CSX then obtained a preliminary injunction from the district court that barred the proposed strike. On January 30, CSX implemented its consolidation. This appeal followed.

II.

Congress has bestowed significant powers on the ICC with respect to rail mergers. The ICC is vested with the "exclusive authority to examine, condition, and approve proposed mergers and consolidations." Norfolk & Western Ry. Co. v. American Train Dispatchers' Ass'n., 499 U.S. 117, 119 (1991). It is also responsible for ensuring that "the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction." 49 U.S.C. § 11347. Pursuant to the Congressional authority vested in the ICC and § 11347, the ICC, in New York Dock , 360 I.C.C. at 60, adopted "a comprehensive set of conditions and procedures designed to meet its obligations under § 11347." American Train Dispatchers' Ass'n., 499 U.S. at 120. These guidelines require consolidating railroads to preserve displaced employees' pay, working conditions, benefits, and rights to collective bargaining. New York Dock, 360 I.C.C. at 77. For example, if an employee is forced to take a lower paying job as a result of the consolidation, a displacement allowance provides the difference in pay between the old and new positions for a period of years. Id. at 78.

New York Dock's interpretation of § 11347 has long been relied upon in settling labor disputes that result from railroad consolidations. See American Train Dispatchers' Ass'n., 499 U.S. at 120-21. New York Dock provides for thirty days of negotiations between the consolidating railroad and its unions "for the purposes of reaching agreement with respect to application of the terms and conditions" of the labor protective compact. 360 I.C.C. at 77. If no agreement is reached by the end of this period, either party may request arbitration. Once arbitration is requested, the parties are called upon to "select a neutral referee" and if they cannot agree upon one, the National Mediation Board shall appoint one. Id. at 78. After the arbitration hearing, the referee has thirty days to render a decision, which"shall be final, binding, and conclusive." Id.

5

Section 11347 and New York Dock seek to achieve a balance between the interests of labor and management. Labor receives guaranteed wage protections while management benefits by avoiding a strike. The avoidance of strikes is crucial to the public interest in maintaining the nation's transportation system. International Ass'n. of Machinists v. Soo Line Railroad Co., 850 F.2d 368, 371 (8th Cir. 1988) (an important goal of the ICA is "preventing labor strife"), cert. denied, 489 U.S. 1010 (1989). "The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern." Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552 (1937). While both sides may thus contest the particulars of a proposed implementing agreement before an arbitrator, the arbitrator's "final, binding, and conclusive" decision prevents either the union or the railroad from holding the nation's transportation system hostage to its aims.

III.

The unions claim that the "final, binding, and conclusive" arbitration provided for by the ICC is unenforceable if the unions choose to strike. The unions contend that because the NLGA generally prohibits labor injunctions, see 29 U.S.C. §§ 101-107, unions may strike if they choose and federal courts are without jurisdiction to enjoin them. Such a strike, however, would unilaterally frustrate the arbitrator's decision, undermine the ICC's efforts to "ensure the development and continuation of a sound rail transportation system," 49 U.S.C. § 10101 (4), and shut down part of the nation's vital rail transportation network.

The NLGA does not command any such result. In fact, the Supreme Court has clearly held that the NLGA will not be interpreted to frustrate the results of binding arbitration. See Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 251 (1970); Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 34 (1957). And the Eighth Circuit has expressly recognized that the NLGA may not operate to restrict the terms of § 11347 of the ICA. Burlington Northern Railroad Co. v. United Transportation Union, 848 F.2d 856, 862-63 (8th Cir.), cert. denied, 488 U.S. 969 (1988); Missouri Pacific Railroad Co. v. United Transportation

6

Union, 782 F.2d 107, 111-12 (8th Cir. 1986). Based on the reasoning of these precedents, we hold that the NLGA does not prohibit an anti-strike injunction that is issued to enforce an arbitration award made pursuant to § 11347 of the ICA.

A.

While the NLGA generally removes from federal courts the juris-diction to enjoin labor strikes, its provisions are not absolute. The NLGA allows for an injunction when "unlawful acts have been threat-ened and will be committed unless restrained," 29 U.S.C. § 107, and when such an injunction would not be "contrary to the public policy declared in" the NLGA, 29 U.S.C. § 101. Moreover, the Supreme Court has curtailed the sweeping nature of the NLGA in the face of subsequent statutes:

> As labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from pro-tection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes. This shift in emphasis was accomplished, however, without extensive revision of many of the older enactments, including the anti-injunction section of the Norris-LaGuardia Act. Thus it became the task of the courts to accommodate, to reconcile the older statutes with the more recent ones.

Boys Markets, 398 U.S. at 251.

Of substantial concern to courts faced with accommodating the NLGA has been the conflict between the NLGA's prohibition of labor injunctions and more recent statutes' arbitration provisions. If a fed-eral court cannot enjoin a strike when a union deems an arbitration award unfavorable, the practical result is that arbitration is meaning-less. Id. at 247. Indeed, such a "`request for judicial enforcement may be viewed as the final step in the arbitration process.'" Sea-Land Ser-vice, Inc. v. International Longshoremen's Ass'n. , 625 F.2d 38, 41-2 (5th Cir. 1980) (citation omitted).

7

Recognizing these principles, the Supreme Court has held that the NLGA cannot be used to circumvent the arbitration provided for by the Railway Labor Act ("RLA"). Chicago River, 353 U.S. at 42. Under the RLA, if parties are unable to reach agreement, the dispute may be referred "by either party to the appropriate division of the [National Railroad] Adjustment Board." Id. at 34 (quoting 45 U.S.C. § 153, 1st (i)). The arbitration awards of the Board "shall be final and binding upon both parties to the dispute." Id. (quoting 45 U.S.C. § 153, 1st (m)). In Chicago River, the union contended that it could avoid arbitration by striking because the NLGA prevented a court from enjoining such a strike. Id. at 34, 39-40. The Supreme Court squarely rejected this argument. It found that the union's interpretation of the NLGA "would render meaningless those provisions in the [RLA] which allow one side to submit a dispute to the Board, whose decision shall be final and binding on both sides," id. at 34, and that "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act," id. at 42.

So too has the Court accommodated the NLGA to arbitration provisions in collective bargaining agreements. In Boys Markets, the union called a strike despite the existence of a clause in its collective bargaining agreement requiring that labor disputes be resolved by arbitration. 398 U.S. at 253. The district court entered an injunction against the strike. The Supreme Court affirmed the district court's determination that "the dispute was subject to arbitration under the collective bargaining agreement and that the strike was in violation of the contract." Id. at 240.

In Boys Markets, the Court focused on the purpose of the NLGA, explaining that "a refusal to arbitrate was not`part and parcel of the abuses against which the [NLGA] was aimed.'" Id. at 242 (quoting Textile Workers v. Lincoln Mills, 353 U.S. 448, 458 (1957)). While the NLGA was aimed at correcting "the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management," arbitration raises no such concern. Id. at 251-53. When a court enforces an arbitrator's award, that court is not interjecting itself on behalf of either side. Sometimes enforcement of a neutral arbitrator's award will benefit the railroads, other times, the unions. See, e.g. Nursing H. & Hosp. Union v. Sky

8

Vue Terrace, 759 F.2d 1094, 1098 (3d Cir. 1985) ("an injunction prohibiting the further distribution of Sky Vue's assets was necessary to ensure that an arbitral award in the union's favor was more than a `hollow formality'"). There is no risk, however, of the systemic bias that motivated Congress to enact the NLGA in 1932. See 29 U.S.C. § 102. Moreover, the NLGA "manifests a policy determination that arbitration should be encouraged." Boys Markets, 398 U.S. at 242. Section 8 of the NLGA requires parties to make "`every reasonable effort' to settle the dispute by negotiation, mediation, or `voluntary arbitration.'" Lincoln Mills, 353 U.S. at 458 (quoting 29 U.S.C. § 108).

While the NLGA's purpose provides the basis for limiting its scope, strikes in the face of labor arbitration awards also fall within the NLGA's exception for "unlawful acts." 29 U.S.C. § 107. Subsequent statutes, such as the Railway Labor Act, establish arbitration as the remedy for certain labor disputes. See 45 U.S.C. § 153. If a union, as in Chicago River, seeks to use a strike to violate such a law, this should qualify as an "unlawful act" within the meaning of the NLGA and should therefore preserve the jurisdiction necessary to grant an injunction. The Supreme Court recognized as much when it stated that there "is no substitute for an immediate halt to an illegal strike." Boys Markets, 398 U.S. at 248 (emphasis added); see also Order of Railroad Telegraphers v. Chicago & North Western Ry. Co., 362 U.S. 330, 338-39 (1960) ("the Chicago River case [ ] held that a strike could be enjoined to prevent a plain violation of a basic command of the Railway Labor Act").

Whether one accommodates the NLGA to arbitration clauses on the basis of the NLGA's purpose or because of the NLGA's "unlawful acts" exception, the result is the same."[T]he Norris-LaGuardia Act must be accommodated to the subsequently enacted provisions . . . and the purposes of arbitration." Boys Markets, 398 U.S. at 250. The district court thus has the jurisdiction to issue injunctive orders to enforce compliance with arbitration awards notwithstanding the provisions of the Norris-LaGuardia Act. See Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n., 491 U.S. 490, 513 (1989).

9

B.

The same principles that mandate accommodation of the NLGA to arbitration clauses in the RLA and in collective bargaining agreements generally also apply to 49 U.S.C. § 11347. The unions seek to distinguish the RLA provision at issue in Chicago River from § 11347 by arguing that the former is a labor statute deserving of accommodation and the latter is a transportation statute undeserving of accommodation. But the arbitration procedures under both statutes are indistinguishable provisions governing labor-management disputes. The arbitration process under both statutes operates to protect interstate commerce (as well as labor and railroads) by prohibiting strikes. Section 11347 also guarantees substantial benefits for labor-- presumably in exchange for the prohibition on the right to strike-- including wage maintenance for a period of years following a consolidation. Accordingly, § 11347, like the RLA's arbitration provision, 45 U.S.C. § 153, is "part of a pattern of labor legislation." Chicago River, 353 U.S. at 42.

Moreover, the unions' argument that the NLGA should only be accommodated to other statutes when the result furthers the interests of labor, misses the point of both Chicago River and Boys Markets. In both of those cases, the unions' proffered interpretation of the NLGA was rejected by the Supreme Court because it would have rendered arbitration involving labor unions meaningless. Such a result, the Supreme Court held, was contrary to both the NLGA and subsequent statutes. See Boys Markets, 398 U.S. at 235; Chicago River, 353 U.S. at 30. The weakness of the unions' argument is made evident by the fact that neither of the principal cases relied upon by the unions involved arbitration. See Pittsburgh & Lake Erie , 491 U.S. at 490; Railroad Telegraphers, 362 U.S. at 330. In fact, Pittsburgh & Lake Erie actually supports our holding here: "Thus, a union may be enjoined from striking when the dispute concerns the interpretation or application of its contract and is therefore subject to compulsory arbitration." 491 U.S. at 513 (emphasis added). In this case, a strike by the unions would have prevented CSX from implementing changes in bargaining agreements that O'Brien, after compulsory arbitration, found were "necessary to implement the transaction proposed by

10

[CSX]" and that the ICC upheld as necessary to "effect that carrier's coordination of operations in a new operating district."*

The "final, binding, and conclusive" arbitration at issue here is simply indistinguishable from the arbitration provisions at issue in Chicago River and Boys Markets. Certainly when Congress enacted § 11347 and the ICC adopted the New York Dock conditions, neither contemplated that the NLGA would frustrate a "final, binding, and conclusive" arbitration that protects workers while obviating the concern that a strike might hold hostage a portion of our national transportation system. The Eighth Circuit recognized this in Burlington Northern:

> [W]hen a consolidation transaction [is] subject to 49 U.S.C. §§ 11341, 11347, statutory provisions which specifically exempt carriers from all other law and require mandatory employee protective conditions, neither the RLA nor Norris-LaGuardia could operate to restrict the terms of the ICA.

848 F.2d at 862-63; see also Missouri Pacific , 782 F.2d at 111-12.

To hold otherwise would thwart the operation of the arbitration provisions in New York Dock. Like previous courts addressing these issues, we too decline to create a conflict between the ICA and the NLGA. See Railway Labor Executives' Ass'n. v. CSX Transportation, 938 F.2d 224, 230 (D.C. Cir. 1991) ("[u]se of the RLA's status quo obligation to halt a sale approved by the ICC under section 11343 would short-circuit the functioning of the ICC and would bring the two statutes into conflict"). After all, it was for Congress and the ICC, pursuant to its delegated authority, "to make the choice of the means by which its objective of securing the uninterrupted service of inter-

_____

*As for the unions' argument that CSX lacked standing to seek the injunction in the first instance, CSX (as the prevailing party in the arbitration and the party that would be injured by the strike) is the logical one to seek enforcement of the arbitration. See Chicago River, 353 U.S. at 30 (injunction granted to railroad to prevent strike that would have circumvented arbitration); Sky Vue Terrace, 759 F.2d at 1094 (injunction granted to union to prevent the dilution of a company's assets necessary to pay an arbitration award).

11

state railroads was to be secured." Virginian Ry. Co., 300 U.S. at 553. Given the "congressional policy in favor of the enforcement of agreements to arbitrate grievance disputes," Lincoln Mills, 353 U.S. at 458-59, we hold here that "Norris-LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process." Boys Markets, 398 U.S. at 252 (explaining the holding of Chicago River, 353 U.S. at 30). As the Supreme Court explained:

> the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate.

Boys Markets, 398 U.S. at 249.

IV.

For these reasons, we affirm the judgment of the district court.

AFFIRMED

12