**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NORFOLK AND WESTERN RAILWAY
COMPANY; NORFOLK SOUTHERN
RAILWAY COMPANY; CSX
TRANSPORTATION, INCORPORATED;
CONSOLIDATED RAIL CORPORATION,
Plaintiffs-Appellees,

and

NORFOLK SOUTHERN CORPORATION,
Counterdefendant-Appellee,

v.

BROTHERHOOD OF RAILROAD SIGNALMEN,
Defendant-Appellant,

and

No. 98-1808

BROTHERHOOD OF LOCOMOTIVE
ENGINEERS; AMERICAN TRAIN
DISPATCHERS DEPARTMENT- BLE;
BROTHERHOOD OF MAINTENANCE OF WAY
EMPLOYEES; THE INTERNATIONAL
BROTHERHOOD OF BOILERMAKERS, IRON
SHIP BUILDERS, BLACKSMITHS, FORGERS
AND HELPERS, AFL-CIO;
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS; NATIONAL
CONFERENCE OF FIREMEN & OILERS;
SHEET METAL WORKERS INTERNATIONAL
ASSOCIATION,
Defendants.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-97-740-R, CA-98-145-R)

Argued: September 23, 1998

Decided: December 29, 1998

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Niemeyer wrote the opinion, in which Judge Wilkins and Judge
Michael joined.

_____

**COUNSEL**

**ARGUED:** John O'Brien Clarke, Jr., HIGHSAW, MAHONEY &
CLARKE, P.C., Washington, D.C., for Appellant. Jeffrey Stephen
Berlin, SIDLEY & AUSTIN, Washington, D.C., for Appellees. **ON
BRIEF:** Michael S. Wolly, Daniel G. Orfield, ZWERDLING, PAUL,
LEIBIG, KAHN, THOMPSON & WOLLY, P.C., Washington, D.C.,
for Appellant. Mark E. Martin, SIDLEY & AUSTIN, Washington,
D.C.; William B. Poff, WOODS, ROGERS & HAZLEGROVE, Roa-
noke, Virginia; Ronald M. Johnson, AKIN, GUMP, STRAUSS,
HAUER & FELD, L.L.P., Washington, D.C.; Arthur P. Strickland,
Roanoke, Virginia, for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

In the wake of an announcement in April 1997 by Norfolk South-
ern Corporation and CSX Corporation that they were acquiring and
dividing a major portion of the assets of Conrail, Inc., the Brother-

2

hood of Railway Signalmen, a union representing employees of the corporations' railroad subsidiaries, gave notice under § 6 of the Railway Labor Act that it wished to renegotiate the terms of its collective bargaining agreements in light of the impact that the acquisition would have on the jobs of employees represented by the union. The district court ruled that the union's § 6 notice was invalid and that the union was required to present its position to the Surface Transportation Board which had exclusive jurisdiction under the Interstate Commerce Act to approve the terms and conditions of the acquisition. On the union's appeal, we reverse the district court's dismissal of Norfolk Southern Corporation, affirm its declaratory judgment, and vacate its anti-strike injunction against the union.

I

In October 1996, Norfolk Southern Corporation and CSX Corporation, both railroad holding companies, announced competing offers to purchase the stock of Conrail, Inc. Several months later, however, they jointly announced an agreement under which subsidiaries of the two corporations would each acquire a portion of Conrail's assets.

In June 1997, these railroad holding companies and their subsidiary railroad corporations filed an application with the Surface Transportation Board ("STB"), the successor to the Interstate Commerce Commission, for approval of the acquisition under the Interstate Commerce Act, 49 U.S.C. § 11324(a). Under the proposed transaction, Conrail's assets were to be divided, with a portion of the lines operated by Norfolk Southern Railway Company, a portion operated by CSX Transportation, Inc., and a portion operated by Conrail for the joint benefit of the acquiring companies. In order to integrate the new lines, the acquiring railroads proposed to modify existing labor agreements to reflect the new operating arrangements. They stated that under the transaction "train crews will be required to operate interchangeably over either CSX or [Norfolk Southern] and allocated Conrail routes in many corridors," which would not be allowed under the existing collective bargaining agreements. Additionally, the railroads claimed that "the efficiencies of the transaction could not be achieved . . . if the expanded CSX and [Norfolk Southern] Systems were required to operate pursuant to existing labor agreements under which different maintenance crews must be used to maintain tracks

3

of existing Conrail and CSX or [Norfolk Southern] in the same geographic area." Moreover, in their application to the STB, the railroads acknowledged that the proposed transaction would net a loss of over 2,600 jobs and a transfer of over 2,300 jobs. To resolve any labor disputes arising from the impact of the proposed transaction, the railroads proposed operating under New York Dock procedures -- originally adopted by the Interstate Commerce Commission for such transactions in New York Dock Ry. -- Control-- Brooklyn Eastern Dist. Terminal, 366 I.C.C. 60, aff'd sub nom. New York Dock R.R. v. United States, 609 F.2d 83 (2d Cir. 1983) -- which would automatically provide established protections to employees and would resolve any labor disputes through binding arbitration under an established time schedule.

Several unions, including the Brotherhood of Railway Signalmen (the "Union"), resisted the railroads' proposal to resolve labor disputes under the New York Dock procedures, contending that all such disputes had to be resolved under the procedures imposed by the Railway Labor Act (the "RLA"), procedures which both sides agree would take longer than the New York Dock procedures and which could lead to a bargaining impasse and ultimately a strike. In their statement of opposition filed with the STB on October 21, 1997, these unions maintained that "implementation of such changes outside RLA processes would violate both the RLA and the [Interstate Commerce Act]. Indeed unions would respond to such change by striking and by submitting claims for compensation under the Tucker Act, 28 U.S.C. § 1346." They advised the STB that several of the unions intended "to utilize the Railway Labor Act's collective bargaining processes to deal with the impact of the proposed transactions on employees they represent" and that unilateral efforts to change their collective bargaining agreements would justify the unions' "resort to self-help."

The day after filing its statement with the STB, the Union delivered a notice under § 6 of the RLA (which authorizes either party to a collective bargaining agreement to serve notice of proposed changes to the agreement and which requires the parties to bargain over the proposed changes), seeking changes of work conditions through RLA procedures. The railroads, however, rejected the § 6 notice, claiming (1) that the notice was barred by a moratorium clause in the collective bargaining agreement with the Union, which prohibited service of a

4

§ 6 notice before November 1, 1999, and (2) that the proposals in the § 6 notice were, in any event, under the sole jurisdiction of the STB because they arose from the transaction pending approval. Notwithstanding its formal position, the railroads agreed to meet with the Union in an effort to resolve their differences, but these meetings failed to produce an agreement.

In light of this impasse, both the railroads and the Union filed separate actions in federal court on October 31, 1997, for declaratory judgment and injunctive relief. The railroads filed their action in the Western District of Virginia, and the Union, along with other objecting unions, filed its action several hours later in the Western District of Pennsylvania. The cases were consolidated in the Western District of Virginia, and the Union's claims were taken as a counterclaim to the railroads' claims. While numerous other unions were originally parties to this consolidated action, all of the other unions have reached agreement with the railroads and have been dismissed from this action.

On various motions of the parties to dismiss and for summary judgment, the district court entered judgment in May 1998 (1) dismissing Norfolk Southern Corporation because it was not a railroad and was not a party to any collective bargaining agreement with the Union; (2) ruling that the Interstate Commerce Act granted the STB sole jurisdiction over labor issues related to the proposed transaction; (3) ruling that the Union's § 6 notice was invalid both because it violated the moratorium clause of the collective bargaining agreements and because the subject matter of the notice was exclusively before the STB; and (4) enjoining the Union for one year "from striking or otherwise exerting coercive self-help in an attempt to block implementation of the Conrail transaction or in an attempt to force plaintiff railroads or affiliated carriers to bargain with them regarding the terms of the Conrail transaction except as specifically authorized by the STB or the [Interstate Commerce Act]." Norfolk and Western Ry. Co. v. Brotherhood of R.R. Signalmen, 11 F. Supp.2d 833, 849 (W.D. Va. 1998).

Two months after entry of judgment in the district court, on July 20, 1998, the STB approved the transaction and imposed the New York Dock procedures for resolving the labor disputes between the

5

parties. In response to the Union's request that the STB not approve all of the collective bargaining agreement modifications proposed by the railroads in their application and that the STB make particular findings as to those changes which were "necessary" to carry out the transaction, the STB ruled:

> In approving a rail merger or consolidation such as this, we have never made specific findings in the first instance regarding any [collective bargaining agreement] changes that might be necessary to carry out a transaction, and we will not do so here. Those details are best left to the process of negotiation and, if necessary, arbitration under the New York Dock procedures. For us to make determinations on those issues now would be premature. . . . We will resolve them only as a last resort, giving deference to the arbitrator.

CSX Corp. et al. -- Control and Operating Leases/Agreements -- Conrail, Inc. & Consolidated Rail Corp., Dec. No. 89 at 126 (July 20, 1998).

This appeal followed entry of the judgment in the district court, but the parties' briefs were submitted after the STB's July 20 order approving the transaction.

II

At the outset, we address the Union's preliminary contention that the district court erred in dismissing Norfolk Southern Corporation from this action.

In the Union's claim against the railroads, which presented the same issue that the railroads' claim against the Union presented -- whether the railroads must negotiate labor changes proposed in con-nection with the transaction under the provisions of the RLA -- the Union named Norfolk Southern Corporation, the corporate parent of two railroads involved, as a defendant. The district court dismissed Norfolk Southern Corporation as a party, reasoning that the corpora-tion was not a "carrier" or "railroad" as used in the RLA and it had no employees represented by the Union. Thus, the court concluded,

6

Norfolk Southern Corporation was not answerable to the Union under the RLA.

The Union contends that Norfolk Southern Corporation"is the party which bargains for its rail subsidiaries." It notes that it sent the § 6 notice to Norfolk Southern Corporation as the negotiating party and that Norfolk Southern Corporation responded to the notice. Accordingly, the Union argues, Norfolk Southern Corporation should be a party to this action because the RLA places obligations not only on the railroads but also on their negotiating agents.

We agree with the Union that the RLA imposes duties not only on carriers, but also on their bargaining agents. For example, § 2 First of the RLA provides, "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements." 45 U.S.C. § 152 First (emphasis added). Similarly, § 2 Seventh prohibits a "carrier, its officers or agents" from changing agreements unilaterally. 45 U.S.C. § 152 Seventh (emphasis added).

The record in this case shows that Norfolk Southern Corporation is in fact a negotiating agent of its subsidiaries, Norfolk and Western Railway Company and Norfolk Southern Railway Company, for the purposes of bargaining with the Union under the RLA. In his affidavit, the Assistant Director for Labor Relations of Norfolk Southern Corporation admitted as much, stating that he was responsible for negotiating collective bargaining agreements for the corporation's subsidiaries and that he in fact negotiated with the Union on behalf of these railroads.

Moreover, Norfolk Southern Corporation is an appropriate party to any action seeking to determine obligations under the Interstate Commerce Act. In its claim, the Union seeks a declaratory judgment that the transaction subject to the STB's approval not include modifications to the collective bargaining agreement. Not only is Norfolk Southern Corporation a party to that transaction, but it is also an applicant before the STB, seeking approval of the transaction.

In these circumstances, we conclude that it was appropriate for the Union to name Norfolk Southern Corporation as a party to the litiga-

7

tion and have it bound by any declaratory adjudication. Accordingly, we reverse the district court's ruling dismissing Norfolk Southern Corporation as a party.

III

We now turn to the principal issue presented by the parties -- whether proposed changes to collective bargaining agreements that are purportedly necessary for a transaction pending approval before the STB must be addressed in the STB proceeding or through procedures authorized and regulated by the RLA. The question of whether labor negotiations in this case are governed by STB-imposed procedures or by the RLA is important to the parties because of its practical effect on the negotiations between them. The Union is interested in maximizing its bargaining leverage, and protracted, perhaps interminable, negotiations backed by a power to strike, which are contemplated by the RLA, would indeed provide the Union with considerable leverage. On the other hand, railroads are interested in avoiding the delay and risk of strikes that could derail their pending transaction, and therefore they favor the more streamlined labor negotiating procedure afforded by the Interstate Commerce Act.

The RLA provides that a railroad may not change the working conditions of its employees "except in the manner prescribed in such [collective bargaining] agreements or in section [6 of the RLA]." 45 U.S.C. § 152 Seventh. Under the RLA, either party to an agreement may serve a § 6 notice on the other party, triggering a mandatory process of negotiation, mediation, and conciliation, during which the status quo must be maintained. See 45 U.S.C.§§ 155, 156. The process is drawn out, and its exhaustion is "almost interminable." Detroit & Toledo Shore Line R. Co. v. United Transp. Union, 396 U.S. 142, 149 (1969). While the parties must bargain in good faith, they are not required to agree, and in the end the Union can resort to self-help by striking in an effort to force acceptance of its bargaining positions. Because the procedures for negotiating changes to labor agreements under the RLA do not include binding arbitration and are not designed to guarantee an agreement within any specified period, unresolved labor disputes subject to RLA procedures have the potential to destroy a proposed merger or acquisition. As the Supreme Court observed, "[t]he resolution process for major disputes under the RLA

8

would so delay the proposed transfer of operations that any efficiencies the carrier sought would be defeated." Norfolk & Western Ry. Co. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 133 (1991). Consequently, avoidance of the RLA bargaining process with its potential for strikes becomes crucial not only to the success of a merger or acquisition but also to the underlying public interest fostered by the ICA in regulating the nation's transportation system. See CSX Transp. v. United Transp. Union ("CSXT v. UTU"), 86 F.3d 346, 349 (4th Cir. 1996). Precisely for this reason, the railroads argue that the more streamlined bargaining procedures authorized by the Interstate Commerce Act are necessary in this case.

With the adoption of the Transportation Act of 1920, Congress pursued a policy of railroad consolidation to promote the health and efficiency of the railroad industry at a time when the survival of many smaller railroads was at risk due to earlier competition and strong enforcement of the antitrust laws. See Train Dispatchers, 499 U.S. at 119; St. Joe Paper Co. v. Atlantic Coastline R.R. Co., 347 U.S. 298, 315 (1954). Although the policy promoting consolidation in the railroad industry has evolved in various directions over the years, the current form of the Interstate Commerce Act ("ICA") still grants "exclusive" authority to the STB to approve, in the public interest, mergers and acquisitions of transportation carriers within its jurisdiction. 49 U.S.C. § 11321(a) (emphasis added). Moreover, it exempts a carrier participating in an approved transaction"from the antitrust laws and from all other law . . . as necessary to let that rail carrier . . . carry out the transaction." Id. (emphasis added). This exemption extends to carriers' obligations imposed by the terms of collective bargaining agreements under the RLA. See Train Dispatchers, 499 U.S. at 133. Indeed, the Supreme Court observed in Train Dispatchers that "obligations imposed by laws such as the RLA [will not be allowed to] prevent the efficiencies of consolidation from being achieved," id. at 133, and accordingly, the RLA is "superseded" by the ICA when an STB-approved transaction requires modification or total abrogation of a collective bargaining agreement authorized or governed by the RLA, id. at 132.

As a consequence, for transactions subject to STB approval, a type of "horizontal preemption" enables the STB to bypass RLA procedures. In doing so, however, the ICA requires the railroad to provide

9

"a fair arrangement" that does not place the railroad's employees in "a worse position related to their employment as a result of the transaction." 49 U.S.C. § 11326(a). To fulfill these obligations, the STB has invariably imposed procedures originally adopted by the Interstate Commerce Commission in New York Dock Ry. -- Control -- Brooklyn Eastern Dist. Terminal, 366 I.C.C. 60, 84-90, aff'd sub nom. New York Dock R.R. v. United States, 609 F.2d 83 (2d Cir. 1983), which are commonly known as the New York Dock procedures. These procedures have "long been relied upon in settling labor disputes that result from railroad consolidations." CSXT v. UTU , 86 F.3d at 349. They are employed because they are designed to enable railroads and unions to "reach the necessary agreement prior to consummation but within a reasonable period so as not to delay unduly consummation of the transaction." New York Dock, 360 I.C.C. at 71.

These New York Dock procedures provide a variety of protections to employees adversely affected by railroad mergers and acquisitions, including monetary benefits for a period of up to six years. They also establish the framework for making the adjustments in workforces and labor agreements that are necessary to the implementation of an STB-approved transaction. Under these procedures, a carrier must give the union 90 days advance notice of proposed alterations to the collective bargaining agreement. New York Dock protocols then establish an expedited timetable for negotiation and, if necessary, provide for binding arbitration. See 360 I.C.C. at 85. While the arbitration under the New York Dock procedures is"final, binding and conclusive," CSXT v. UTU, 86 F.3d at 349, it is subject to review by the STB, see 49 C.F.R. § 1115.8. Moreover, the STB's decision reviewing an arbitration under the New York Dock procedures is subject to judicial review under the Hobbs Act, 28 U.S.C. §§ 2342(5), 2321. We have held, however, that a union cannot lawfully strike to prevent a railroad from taking actions authorized by an arbitration award entered under the New York Dock procedures. See CSXT v. UTU, 86 F.3d at 351-52.

While the Union in this case does not readily acquiesce in the Supreme Court's holding in Train Dispatchers that the STB is empowered to approve modifications of collective bargaining agreements, it does acknowledge that Train Dispatchers holds that the ICA supersedes the RLA and RLA agreements when necessary to carry

10

out an approved transaction. See Train Dispatchers, 499 U.S. at 132. The Union argues, however, that because the Supreme Court did not determine when the ICA's statutory override is "necessary," the standards for this "necessity component" are an open question. It points out that in Train Dispatchers, the Supreme Court assumed, without deciding, that the override was in fact necessary in the case before it. See id. at 127. Thus, the Union maintains that in this case, the district court could not make the assumption relied upon in Train Dispatchers but was required to find the "necessity component" before ruling as it did. Because the district court did not find that the proposed changes were "necessary" to carry out the railroads' acquisition of Conrail's assets, the Union argues, the court could not prohibit the Union from challenging changes required by that transaction under the RLA.

The Court in Train Dispatchers did, indeed, assume that the collective bargaining changes were necessary for the purposes of its holding. See 499 U.S. at 127. It stated that "neither the conditions of [STB] approval, nor the standard for necessity, is before us today." Id. at 134. But the fact that the Court did not articulate the standard for determining necessity under § 11321(a) does not mean that the district court in this case was required to craft such a standard.

The "necessity component" referred to by the Union defines the scope of the immunity from "other law" afforded by the ICA for "approved" transactions. Section 11321(a) of the ICA provides that a railroad participating in an approved transaction is "exempt from the antitrust laws and from all other law . . . as necessary to let the rail carrier . . . carry out the transaction." 49 U.S.C. § 11321(a) (emphasis added). Thus, while the necessity requirement defines the breadth of the immunity flowing from an approved transaction, it does not define, nor even address, the scope of the STB's exclusive jurisdiction to consider and approve the terms and conditions of such a transaction. Yet, it is the scope of the STB's exclusive jurisdiction, not the scope of any exemption that might result from an "approved" transaction, that must be determined to dispose of the case before us because the question we face is whether the district court erred in requiring the parties to proceed before the STB rather than under the RLA.

The scope of the STB's jurisdiction is first defined by its jurisdiction over railroads, see 49 U.S.C. § 10501, and is fleshed out by its

11

exclusive authority to approve transactions involving railroads described in 49 U.S.C. § 11323, see 49 U.S.C. § 11321. The Supreme Court has interpreted this jurisdiction broadly, noting that the STB has "exclusive authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers." Train Dispatchers, 499 U.S. at 119-20. Moreover, the ICA expressly provides that the terms and conditions exclusively subject to STB approval include those relating to the relationship between a railroad and its employees. For instance, § 11324 provides explicitly that the STB shall consider "the interest of rail carrier employees affected by the proposed transaction," 49 U.S.C. § 11324(b)(4), and § 11326 imposes a duty that employees of the railroads be provided a "fair arrangement," 49 U.S.C. § 11326(a). Thus, to the extent that a transaction subject to the STB's approval impacts collective bargaining agreements or the relationships between railroads and their employees, the STB has exclusive jurisdiction in the first instance to consider the issues.

If, in the exercise of its duties, the STB exceeds the scope of its authority in approving a transaction subject to its jurisdiction, a party may seek review of the STB's decision in a court of appeals under the provisions of 28 U.S.C. § 2342(5) (vesting the courts of appeals with exclusive jurisdiction to review all "final orders of the Service Transportation Board made reviewable by section 2321 of this title") and 28 U.S.C. § 2321 (providing for judicial review of the STB's orders and decisions).

Accordingly, in considering an application for approval of a transaction subject to its jurisdiction, the STB has exclusive authority to resolve objections to the application, including objections by unions that a particular proposal to alter a collective bargaining agreement is not necessary to the transaction.

In this case, as a result of their announced acquisition of Conrail's assets, the railroads stated that "train crews will be required to operate interchangeably" over various railroads, a requirement which would not otherwise be allowed under existing collective bargaining agreements between them and the Union. In addition, the railroads pointed out that efficiencies of the transaction would result in the loss of over 2600 jobs and the transfer of over 2300 jobs. These proposed

12

changes, and others like them, implicate the collective bargaining agreements between the railroads and the Union, and outside of the proposed transaction's context, they would have to be negotiated under the RLA. But because the railroads claim that these changes are necessary to carry out the proposed transaction, the proposals become part of the railroads' application to the STB for approval under the ICA. If the Union had objections to these proposed changes, it would have had to oppose them by participating in the STB proceeding, which it in fact did, and it could have sought judicial review of any decision it wished to challenge. But the Union was not entitled to circumvent the STB's exclusive authority by entering federal court in the first instance and seeking to adjudicate the very same issues in that court.

The Union cannot dispute that the proposed collective-bargaining-agreement changes that it is challenging in this action are the same ones to which it objected before the STB in response to the railroads' application. Indeed, the Union's complaint in this case defines its challenge in these very terms. Its complaint alleges that it is seeking a declaratory judgment requiring the railroads to abide by § 6 of the RLA with respect to "changes to agreements concerning rates of pay, rules, and working conditions that defendants have proposed as part of their plans to divide Conrail between CSXT and[Norfolk Southern]" and "changes and agreements that the plaintiff has proposed in response to carriers' proposals." (Emphasis added). Accordingly, the merits of these challenges must be decided in the first instance by the STB and not by the district court.

We note further that the STB did in fact approve the railroads' acquisition of Conrail's assets on July 20, 1998, and in doing so, acted upon its jurisdiction over the questions raised by the Union by directing that they be resolved through the New York Dock procedures. The Union will have adequate opportunity through that process to present its position and ultimately to challenge any ruling against it in a federal court.

In short, we conclude that any effort to challenge changes in the collective bargaining agreements proposed in the transaction by which the railroads are acquiring Conrail's assets must be presented in the first instance to the STB under its exclusive jurisdiction and

13

may not be negotiated under the RLA. For these reasons, we affirm the district court's declaratory judgment committing these issues to the STB and declaring that they are not appropriately resolved under § 6 of the RLA.

IV

The Union also contends that the railroads' claim for an injunction prohibiting future strikes "did not present a case or controversy within the district court's Article III jurisdiction" and, in any event, that the injunction entered by the district court violates §§ 7 and 8 of the Norris-LaGuardia Act, 29 U.S.C. §§ 107 and 108. It argues that the railroads lacked constitutional standing because they presented no evidence that they faced "an imminent threat of a strike" and therefore that they failed to establish injury in fact, a requirement of a live case or controversy under Article III of the Constitution.

A

If the railroads had only sought injunctive relief and the threat of the strike sought to be enjoined had not been imminent, then the railroads would indeed have lacked standing, and the district court could not have entertained their claim for an injunction. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1994).

But the case before us does not depend, in a constitutional sense, on the claim for injunctive relief. The railroads' request for an injunction was ancillary to the remedy they sought on their central claim -- a declaratory judgment that the ICA supersedes the RLA in connection with the approval of a railroad merger or acquisition. The live controversy in the case before us thus is based on the railroads' claim that they need not honor the Union's § 6 notice to negotiate the labor consequences of the anticipated acquisition under the RLA and that they may instead rely on the rulings of the STB. The parties do not suggest that the proposed railroad acquisition was speculative or hypothetical. It was an agreed-to deal which would be closed after appropriate approvals from the STB were obtained. Indeed, the authenticity of this controversy is evidenced by the fact that both the railroads and the unions considered it necessary to file suits to resolve the dispute. Accordingly, we conclude that the controversy over how

14

to resolve existing labor disputes presents us with a live case in the constitutional sense and that the declaratory judgment remedy invoked by both parties was an appropriate exercise by the district court of its Article III power.

B

But even with an Article III case properly before us, we must nevertheless determine whether injunctive relief was appropriate if, as the Union claims, there was no evidence of an imminent threat to strike. A court's equitable power to grant injunctive relief is constrained by limitations which are similar in nature to prudential standing requirements. "An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action." Bloodgood v. Garraghty, 783 F.2d 470, 475 (4th Cir. 1986); see also O'Shea v. Littleton, 414 U.S. 488, 502 (1974) (noting that"the likelihood of substantial and immediate irreparable injury" is a requirement for the issuance of an injunction); Congress of Racial Equality v. Douglas, 318 F.2d 95, 100 (5th Cir. 1963). An injunction"will not be granted against something merely feared as liable to occur at some indefinite time in the future." Bloodgood, 783 F.2d at 475 (quoting Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931)).

While we have no doubt that if a labor strike were to take place, it would impose real injury on the railroads, as well as on society at large, we must focus our inquiry on whether a strike was imminent to determine whether equitable relief was warranted. The railroads contend that a strike was imminent based on the statements that the Union and the other unions submitted to the STB. In those statements, the unions asserted that implementation of changes to the collective bargaining agreements outside the RLA would violate both the RLA and the ICA and that the unions would respond "by striking." These unions also advised the STB that some of them intended to utilize the RLA procedures and that they believed that unions could respond to unilateral changes to their collective bargaining agreements with "self-help." Apart from these statements filed before the STB, however, the record contains no evidence indicating that any union intended to strike or that any union had acted on a plan to strike. In addition, the Union maintains in its brief that it has no intention of striking.

15

Statements by the Union in legal papers filed before the STB that it would strike are, we believe, most accurately construed as part of the Union's legal argument delineating those circumstances under which it believed it could legally strike. These statements were likely a form of advocacy. But even if they are taken at face value, their promise was conditioned on the railroads' adoption of the proposed changes. The railroads, however, have not unilaterally imposed those changes, nor could they have done so. The New York Dock procedures, to be sure, require the railroads to negotiate with the Union before adopting any changes, and only if the two sides could not agree would the matter be submitted to binding arbitration. New York Dock, 366 I.C.C. at 85. Thus, the conditions that the Union claimed would lead to a strike would not occur absent various decisions by the railroads, the Union, the independent arbitrator, and the STB. With all of these contingencies, any possibility of a strike was entirely speculative.

The fact that the strike threat was conditioned on future, speculative events distinguishes this case from CSXT v. UTU, where we rejected a standing defense and affirmed the entry of an anti-strike injunction to enforce compliance with an arbitration award. See 86 F.3d 352 n.*. In CSXT v. UTU, the arbitrator and the Interstate Commerce Commission had already sided with the railroad, agreeing that certain changes in the labor agreements were necessary to facilitate a consolidation. The railroad informed the unions that it would implement the consolidation, along with the approved labor changes. Four days before the consolidation was to take place, the unions informed the railroad that they would strike unless the railroad rescinded its plans. Id. at 348. In that case, therefore, there was a direct threat of a strike in the face of the railroad's announcement that it would carry out the approved transaction. Because the strike was imminent, we concluded that the court had the power to issue an injunction.

But the circumstances in CSXT v. UTU are unlike those presented to the district court in this case where the strike threat was conditioned on future events -- the acceptance of the railroads' proposed changes by either the Union or the arbitrator -- that might or might not have happened. While the district court found that the Union's statements to the STB "provided the railroads with significant insecurity as to maintaining their economic well-being," Norfolk & Western

16

Ry. Co., 11 F. Supp.2d at 849, such insecurity does not amount to an imminent injury. Moreover, we have no reason to doubt the Union's representation in its brief that it does not intend to strike. We assume that the Union will obey the law as established by the courts and by the rulings of the STB.

In short, we conclude that the railroads failed to show the imminent threat of illegal action and injury required for the entry of an injunction, and therefore we vacate the injunction entered by the district court.

V

We reverse the district court's dismissal of Norfolk Southern Corporation; we vacate its anti-strike injunction; and we otherwise affirm the district court's judgment.

IT IS SO ORDERED.

17